LoConto, P.J.
The plaintiff, as Administratrix of the Estate of Jessica Davila, brought this action against the Arbella Mutual Insurance Company seeking recov *231 ery pursuant to a policy of insurance between Felipe Padilla and the defendant. The four count complaint claims that the defendant is liable to the decedent (1) for the pain and suffering prior to her death, (2) under General Laws chapter 229, section 2, (3) for Breach of Contract and (4) for Unfair Settlement Practices. After trial held on March 3,1998, the court found in favor of the plaintiff on counts two and three and awarded one recovery. The defendant commenced this appeal pursuant to Rule 8C of the District/Municipal Courts Rules for Appellate Division Appeal. We rule that the trial judge erred by ruling that the deceased was a member of the insured’s household, as defined by the policy of insurance with the defendant, and reverse the judgment The facts and issues necessary for an understanding of this case are as follows.
There is no dispute that Jessica Davila, who was born on November 20, 1981, died on October 15,1995, as a result of injuries she sustained as a passenger in a motor vehicle operated by Ivalesse Rodriguez, when said vehicle was involved in a one car accident in Springfield, Massachusetts. There was also no dispute that the automobile operated by Ivalesse Rodriguez was uninsured at the time of the accident. By the express language of the policy, the defendant is liable for bodily injury to people injured or killed in certain accidents caused by uninsured autos. However, it is liable only if the injured person is entitled to recover from the owner or operator of the uninsured auto. Although on appeal the defendant challenged the adequacy of the evidence to support the plaintiffs claim that the operator of the vehicle in which the deceased was a passenger was negligent, lack of insurance coverage renders that issue unnecessary for a resolution of the case.
At the time of her death, Jessica Davila resided in the same household with her mother, Rosa C. Saldana, and Mr. Padilla. William Davila had been previously adjudicated the father of Jessica Davila. The plaintiff, on behalf of Jessica Davila, sought coverage from uninsured benefits coverage provided by a policy of insurance issued to her boyfriend Felipe Padilla. The defendant claims error in the trial judge’s denial of its Motion to Dismiss for Lack of Subject Matter Jurisdiction, denial of its Motion for a Directed Verdict, rulings on various requests for rulings of law and findings of fact, and lastly, that the weight of the credible evidence did not support a judgment in favor of the plaintiff. We rule that there was insufficient evidence to support the trial court’s determination that the deceased was a covered person under the policy with the appellant.
The plaintiff sought uninsured motorist benefits against the defendant claiming the decedent was a household member of the policyholder. The Standard Massachusetts Automobile Insurance Policy (sixth edition) defines household member as "... anyone living in your household who is related to you by blood, marriage or adoption. This includes wards, step-children or foster children.” It is uncontro-verted that the deceased was not related to the insured by blood, marriage or adoption. In addition, she was not his step-child or foster child. The plaintiff’s contention is that the deceased was the “de facto” ward of the insured.
The resolution of whether Jessica is a ward of the insured is a question of law to be applied to the facts found by the trial judge. Vaiarella v. Hanover Ins. Co., 409 Mass. 523 (1991). The term “household member” has never been defined by the courts because the provision was prescribed by statute, and therefore, not controlled by an insurer. Id. at 526. “The rule of construction resolving ambiguities in a policy against the insurer is inapplicable.” Bilodeau v. Lumbermen Mut. Cas. Co., 392 Mass. 537, 541, 467 N.E.2d 137 (1984).
Decisions from other courts which have explored the meaning of ‘ward’ have emphasized that the status comes about through court or State action. See, e.g., In re Jennings, 68 Ill. 2d 125, 132-133, 11 Ill. Dec. 256, 368 N.E.2d 864 (1977); State v. Dunham, 213 Kan. 469, 475-476, 517 *232 P.2d 150 (1973); Hartman v. Insurance Co. of N. America, 106 Mich. App. 731, 738-740, 308 N.W.2d 625 (1981) (construing insurance policy language similar to that before us — an incompetent had been placed in a private facility by State action and was held to be a ward of the facility); Grover v. Martone, 127 Misc. 2d 40, 41, 485 N.Y.S.2d 191 (N.Y. Sup. Ct.1985).
Pisani v. Travelers Ins. Co., 29 Mass. App. Ct. 964, 965 (1980).
Nevertheless, it is possible that an individual can achieve the status of a ward or foster child without formal judicial or government order. Id. at 965. In any case, a ward is someone under protection because they are unable to take care of themselves.
Paired with a ward, as the term is commonly used, is a protector, be that a guardian, conservator or court. By way of example, 'ward’ is used in the General Laws in connection with the appointment of guardians of minors (G.L.c. 201, §2), appointment of testamentary guardians (G.L.c. 201, §3), guardianship of a spendthrift (G.L.c. 201, §11), termination of the guardianship of a mentally ill or retarded person or spendthrift (G.L.C. 201, §13), appointment of temporary guardians (G.L.c. 201, §14), appointment of conservators (G.L.c. 201, §16), and discharge of a conservator (G.L. [29 Mass. App. Ct. 965] c. 201, §18).
Id. at 965.
Although he ruled on the parties’ requests for findings of fact, the trial judge made no subsidiary findings to support his ultimate ruling that Jessica had attained the status as the insured’s ward. The court’s finding is complicated by the allowance of contradictory requests for findings and rulings, on the one hand crediting Mr. Padilla with providing Jessica with economic support, and on the other, finding that Jessica’s financial needs “were substantially, if not wholly, satisfied by her mother, Rosa Saldana.” In addition, the trial judge adopted a request that Mr. Padilla provided a “long term commitment to the authority and guidance of Jessica” and likewise allowed a request that on the date of her death, "Jessica Davila’s moral guidance was substantially, if not wholly, provided by her mother, Rosa Saldana.” These contradictions require that we review the evidence and determine if as a matter of law, Jessica was the insured’s ward at the time of her death.
Mr. Padilla and Ms. Saldana were the only witnesses at trial. Mr. Padilla testified that he lived with Ms. Saldana and her children for about four or five years. He lived there for two years before Jessica’s death. During this time, he was married to another woman and had eight children with her. He testified that he visited his children weekly. Mr. Padilla testified that he would take Jessica to the store and different places, would pick her up from school on occasion, buy her things and give her money. However, he did not elaborate on the frequency of the rides or the amounts of these gifts. Jessica referred to him as “Felipe” and he testified that he would discipline her, although never strike her. He also testified that he felt like her father. However, he was uncertain of her grade or the name of her school. He had no knowledge of her extra-curricular interests or her long term plans. He testified that the apartment rent was $400.00 per month, and that he paid his $100.00 share as one of four tenants. He never included Jessica as a dependent for tax purposes.
Rosa Saldana testified that Felipe acted like a father and would advise Jessica, take her to the movies and buy her things, including candy. However, evidence was introduced from Ms. Saldana’s deposition that she acted as both a mother and father to her children and would go to the school to meet with her daughter’s *233 teachers. In addition, there was evidence from Ms. Saldana’s deposition that she bought Jessica everything and that Felipe never disciplined Jessica. There was no evidence offered to suggest that Mr. Padilla had a similar or different relationship with Ms. Saldana’s other child. In addition to the proceeds from a collection, Ms. Saldana paid the funeral expenses.
There is no “bright line test” for determining a claimant’s status as a “household member,” and our analysis must proceed on a case-by-case basis. “ [B] ecause modern society presents an almost infinite variety of possible domestic situations and living arrangements, the term ‘household member’ can have no precise or inflexible meaning.” Gianely v. Travelers Insurance Companies, 1995 Mass. App. Div. 155. Applying the above mentioned factors that have been employed in this commonwealth and in other jurisdictions, we rule that the evidence fails to satisfy the requirement that the deceased was a member of the insured’s household at the time of her death. Mr. Padilla was the boyfriend of the decedent’s mother. Whatever kindness he showed Jessica was out of friendship, not paternalistic responsibility. Jessica was not under the protection of Mr. Padilla, because she could not care for herself, as the term “ward” connotes, but principally cared for by her mother who was capable to perform the task without Mr. Padilla’s assistance. As a matter of law, Jessica Davila was not the ward of Mr. Felipe Padilla and therefore not a member of his household under the policy of insurance with the defendant. Therefore, we order that the clerk of the Springfield District Court vacate the judgment in favor of the plaintiff and order that judgment enter for the defendant.