Curley, J.
The defendants Atlantic Mutual Insurance Company ("Atlantic Mutual”) and Centennial Insurance Company (“Centennial”) (collectively, “the Defendants”) move for summary judgment on the plaintiffs’ declaratory judgment action against them. I held a hearing on September 21, 2001. For the following reasons, the Defendants’ motions are allowed, and a declaration shall enter that Matthew Richmond (“Matthew”), a/k/a Matthew Richardson, is not an insured under the policies issue by the Defendants to Frederick Richmond (“Frederick”).
UNDISPUTED FACTS
The undisputed facts, or the facts taken in the light most favorable to the plaintiffs, reveal in summary form that Frederick and Matthew met in 1986, when Matthew was 26. Matthew was then known as Matthew Richardson. At some point Matthew and Frederick began to refer to Matthew by the last name Richmond, although no court filings demonstrating a change of name have been presented. Frederick was older than Matthew. Frederick and Matthew began to live together that month, and formed an intimate personal relationship. Each had an apartment in New York City, and Frederick owned a home in Egremont, Massachusetts where Frederick and Matthew lived together. Matthew had no ownership interest in the Egremont home.
During most of their relationship, Frederick held Matthew out as his adopted son, stating in a deposition that Matthew was his adopted son, signing medical admissions forms as Matthew’s legal guardian or closest available relative, and Frederick’s lawyers once referred to Matthew as Frederick’s adopted son in a court filing. However, there is no evidence from a Massachusetts court, a New York court, or any other court that Frederick legally adopted Matthew.
In August 1989, Matthew became severely ill with symptoms and complications secondary to HIV/AIDS. He required hospitalization at least four times, three of which occurred in New York and one in Massachusetts. Frederick, who financially supported the unemployed Matthew from the time they met until Matthew’s death in 1991, cared for Matthew throughout Matthew’s illness, dealing with Matthew’s physicians, hiring nurses to care for Matthew, and ensuring that Matthew’s nutritional and medical needs were met. Indeed, Matthew’s 1991 hospital admission record lists Frederick as his father, and the physician’s discharge summary makes the same reference.
The plaintiffs apparently secured a district court judgment against Matthew’s estate arising from their work at Frederick’s Egremont home. They now seek a declaration *228 that Matthew is an insured under Frederick’s insurance policies with either or both Defendants.
The Atlantic policy defines an “insured” in relevant part as
“you and members of your household who are:
a. your relatives;
b. other persons under the age of 21 and in the care of any person named above.”
The Centennial policy states in relevant part that
“[t]he unqualified word ‘insured’ includes the named insured [Frederick] and also
a. any relative of, or if residents of the named insured’s household, the wards of the named insured and any other person under the age of twenty-one in the care of an insured ..."
DISCUSSION
1. Whether Matthew Was Frederick’s “Relative” for Coverage Purposes Under Both the Atlantic Mutual and Centennial Policies.
The plaintiffs first argue that Matthew, as Frederick’s adopted son, was Frederick’s relative, and hence is an insured under both Defendants’ policies. I disagree. As one authority states:
Since English common law did not recognize adoption, early Massachusetts law did not permit adoptions. However, in 1851 the Commonwealth became the first common law jurisdiction to authorize judicially approved adoption by statute.
Because the common law did not permit adoption the modern practice of adoption is entirely a creature of statute. The Commonwealth has a complete statutory scheme governing adoption, and every other American state has enacted an adoption statute. Because adoption statutes are in derogation of the common law they are strictly construed.
Kindregan and Inker, Massachusetts Practice, Vol. 3, Section 63.1, pp. 134-35 (West, 1996) (footnotes omitted). See generally G.L.c. 210 et seq.; Adoption of Tammy, 416 Mass. 205, 210 (1993) (“[t]he law of adoption is purely statutory, and the governing statute is to be strictly construed in all of its essential particulars”). This is also true in New York. See generally Domestic Relations Law Section 109 et seq.; Matter of Anonymous, 40 N.Y.2d 96, 351 N.E.2d 707, 710 (Ct.App. 1976) (“[ajdoption, unknown to the common law, exists solely by statute”).
Based on the undisputed facts, and the law, Frederick never legally adopted Matthew. The plaintiffs have presented no court orders, decrees, or other adjudication, from Massachusetts, New York, or elsewhere that Frederick ever legally adopted Matthew. Frederick’s, Matthew’s or anyone else’s statements to the contrary are simply insufficient. Frederick stating that Matthew was his adopted son does not make him so anymore than Frederick saying Matthew was his brother, nephew, or cousin would make him so. As but one illustration of this point, I doubt that, had Frederick died intestate the day before Matthew did, Matthew would inherit any of Frederick’s assets under the intestacy laws. More broadly, one can only imagine the legal chaos that would ensue if two unrelated people could decide, on their own, to become related to each other merely by saying so, and then both prove and enforce that “relationship" under the law on that basis. By analogy, I note that efforts to treat unmarried people as married for certain purposes requires legislative action (so-called “domestic partner” laws) and not merely the wish of two people to be treated as the law treats spouses.
Thus, the most that the plaintiffs could prove is that Frederick, Matthew, his lawyers, and medical personnel referred to Matthew as Frederick’s adopted son. But that evidence, even if believed by a fact finder, is insufficient in law to warrant the conclusion that Matthew was Frederick’s adopted son, and hence his relative. The plaintiffs have produced no evidence from which a fact finder could properly conclude that Frederick met the statutory requirements for adopting Matthew either in Massachusetts, New York, or elsewhere. Accordingly, because the plaintiffs will not be able to. produce such proof, the Defendants are entitled to summary judgment on the plaintiffs’ claim that, as a relative under Frederick’s policies, Matthew was an insured under those policies. See, e.g., Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Given this ruling, and the undisputed fact that Matthew met Frederick when Matthew was 26, Matthew does not fall under any other proffered definition of insured under the Atlantic Mutual policy (“other persons under the age of 21 and in the care of the person named above”). Accordingly, I ALLOW Atlantic Mutual’s summary judgment motion, and a declaration will enter that Matthew is not an insured under Frederick’s policy with Atlantic Mutual.
2. Whether Matthew Was Frederick’s ‘Ward” for Coverage Purposes Under Centennial’s Policy.
Centennial’s policy differs from Atlantic Mutual’s policy, however. In addition to defining an insured as the named insured and any relative of the named insured, it also includes “if residents of the named insured’s household, the wards of the named insured, and anyone under the age of 21 in the care of an insured . . ,”[1] The plaintiffs argue that a fact finder could conclude that Matthew was Frederick’s “ward,” and, if so, that Matthew would be an insured under this part of Centennial’s policy. I disagree that a fact finder could find that Matthew was Frederick’s “ward” for coverage purposes under Centennial’s policy.
In support of their argument, the plaintiffs point to a dictionary definition of the noun ward as one “under the care and protection of another,” and stress that where an insurance policy is ambiguous, it is to be interpreted in favor of the insured. See, e.g., Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 285 (1997). While this latter principle is undoubt *229 edly correct, it will not bear the weight that the plaintiffs place on it in this case.
Interpreting the meaning of the terms in an insurance contract is a question of law for the court. E.g., County of Barnstable v. American Financial Corporation, 51 Mass.App.Ct. 213, 215 (2001). “ ‘Interpretation of an insurance contract is no different from interpretation of any other contract.’ In the absence of an ambiguity, [a court] will ‘construe the words of the policy in their usual and ordinary sense.’ ”116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001) (quoted cases omitted). “A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one. An ambiguity is not created simply because a controversy exists between the parties. ‘Nor does the mere existence of multiple dictionary definitions of a word, without more, suffice to create an ambiguity, for most words have multiple definitions.’ A[ ] . . . clause may be ambiguous, however, when read in the context of the entire policy or as applied to the subject matter.” County of Barnstable, 51 Mass.App.Ct. at 215 (citations and quoted case omitted). In this case, I need not set forth an “unambiguous” definition of the noun “ward” for, whatever else it might mean, it is clear — unambiguous—that Matthew was not Frederick’s “ward.”
Only one recent appellate case has focused on the definition of the noun “ward.” In Pisani v. Travelers Insurance Company, 29 Mass.App.Ct. 964 (1990), the court stated:
In common signification, a ward is someone under protection because a person is unable to take care of herself or himself. Paired with a ward, as the term is commonly used, is a protector, be that a guardian, conservator or court. By way of example, “ward” is used in the General Laws in connection with the appointment of guardians of minors, appointment of testamentary guardians, guardianship of a spendthrift, termination of the guardianship of a mentally ill or retarded person or spendthrift, appointment of temporary guardians, and discharge of a conservator. Similar conjunctions of “ward” with legally created supervisory capacity appear in the cases.
Dictionary definitions of “ward” describe a minor or an incompetent person placed under protection by an order of a court, at least in a legal context, and the context in which we are examining the word is in a document designed to prescribe legal rights and obligations . . .[2]
Decisions from other courts which have explored the meaning of “ward” have emphasized that the status comes about through court or State action. We do not discount the possibility that the status of a ward or foster child could be achieved without formal judicial or governmental order.
Id. at 964-65 (citations and footnote omitted).
The undisputed facts here demonstrate that two adults began an intimate personal relationship when both were healthy (or, at least, when Matthew was not suffering from a debilitating case of HIV/AIDS). Frederick provided Matthew financial support throughout the relationship. When Matthew became ill, Frederick (along with private nurses and other health care providers) cared for Matthew until Matthew’s death. At no time did Frederick, by court appointment or other State action, have any legal obligation to, or authority over, Matthew. Nor, obviously, was. Matthew a minor at any point in his relationship with Frederick, compare Pisani, 29 Mass.App.Ct. at 964, much less did they have the lifelong relationship between a family and a thirteen-day-old child the family took in, had baptized, enrolled in school, and raised, as in Busby v. Ranger Insurance Company, 708 S.W.2d 795, 796 (Mo.Ct.App. 1986), discussed in Pisani, 29 Mass.App.Ct. at 965. Frederick and Matthew’s relationship is no different from the untold number of adult couples who live together and share both the good and bad in life, including taking care of each other when ill, even when (perhaps especially when) that illness becomes terminal. Whether the relationship is intimate or not, whether it is between heterosexuals or homosexuals, and whether it is between adults of the same or differing ages, it is clear — unambiguous—that when one adult in the relationship falls ill, even terminally ill, that person does not become the other’s “ward,” in the eyes of the law.
Were the result otherwise, each case would require not only examining all aspects of the relationship between the individuals involved but also the length and extent of the purported ward’s illness and the nature and extent of the care provided by the “protector.” Would one suffering from a serious, but non-terminal illness, become a ward? If not, why not? And, if so, at what point would “ward” status begin, and when would it end? Would the test be subjective, in which case a person willing or able to fight the illness more vigorously would not become a ward while another, not so disposed or able, would; or would it be objective, in which case a person with a weaker constitution who became incapacitated would not be deemed a ward because, for example, an “ordinary person in the same circumstances” would not have suffered to the same extent. While line-drawing is part and parcel of adjudicating disputes, adopting the plaintiffs’ argument would implicate so many variables so as to undermine substantially the stability that is desirable for both insureds and insurers. This consideration also weighs in favor of the conclusion that, whatever else the norm “ward” might mean, it does not apply to Matthew’s relationship with Frederick.
Ultimately, then, whatever the noun “ward” means, it is clear — again, unambiguous — that it does not encompass the relationship between Frederick and Matthew in this case. Accordingly, Matthew was not Frederick’s ward. There being no other basis to deem *230 Matthew an “insured” under Frederick’s policy with Centennial, Centennial’s motion for summary judgment is ALLOWED.
I therefore declare that Matthew is not an insured under Frederick’s insurance policies with either Atlantic Mutual or Centennial.

 The Defendants properly do not argue that they are entitled to summary judgment on the issue of Matthew being a “resident” of Frederick’s household. Defendants’ Brief at 5-6, nn.7, 8.

 In the American Heritage Dictionary, 1363 (2d College ed. 1982), cited in Pisani, 29 Mass.App.Ct. at 965, there are eleven definitions (plus sub-parts) of the noun “ward.” The definitions applicable here are “6. a. Law. A minor or incompetent person placed under the care or protection of a guardian or court, b. A person under the protection or care of another.”